## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

DEVON NICOLE FEATHER,

       Plaintiff,

       v.

KILOLO KIJAKAZI, Acting Social
Security Commissioner,

       Defendant.

CIVIL ACTION NO. 3:21-cv-01588

(SAPORITO, M.J.)

## MEMORANDUM

In this matter, the plaintiff, Devon Nicole Feather, seeks judicial review of the final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). The matter has been referred to the undersigned United States magistrate judge on consent of the parties, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

### I.  BACKGROUND

On August 24, 2017, Feather protectively filed applications for disability insurance benefits and supplemental security income, both asserting a disability onset date of August 14, 2017. Her claims were

initially denied by state agency reviewers on November 27, 2017. The plaintiff then requested an administrative hearing.

A hearing was held on January 23, 2019, before an administrative law judge, Richard E. Guida (the "ALJ"). In addition to the plaintiff herself, the ALJ received testimony from the plaintiff's mother, Karen Feather, and an impartial vocational expert, Paul A. Anderson. The plaintiff was represented by counsel at the hearing.

On March 25, 2019, the ALJ denied Feather's application for benefits in a written decision. The plaintiff sought further administrative review of her claims by the Appeals Council. On May 26, 2020, the Appeals Council vacated the ALJ's March 2019 decision and remanded the matter for further proceedings.

A second hearing was held on December 16, 2020, before the same ALJ. In addition to the plaintiff herself, the ALJ received testimony from an impartial vocational expert, Michael Kibler. The plaintiff was again represented by counsel at this second hearing.

On February 2, 2021, the ALJ denied Feather's application for benefits again in a second written decision. The ALJ followed the familiar five-step sequential evaluation process in determining that Feather was

not disabled under the Social Security Act. *See generally Myers v. Berryhill*, 373 F. Supp. 3d 528, 534 (M.D. Pa. 2019) (describing the five-step sequential evaluation process). At step one, the ALJ found that Feather had engaged in substantial gainful activity during two quarters—the fourth quarter of 2019 and the first quarter of 2020—but she had otherwise refrained from engaging in substantial gainful activity since her alleged onset date. The remaining findings by the ALJ were therefore addressed to the periods when Feather did not engage in substantial gainful activity.

At step two, the ALJ found that Feather had the severe impairments of: epilepsy; migraine headaches; obesity; bipolar disorder; generalized anxiety disorder; major depressive disorder; obsessive-compulsive disorder; and panic disorder.

At step three, the ALJ found that Feather did not have an impairment or combination of impairments that meets or medically equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. In doing so, the ALJ considered Feather's limitations in four broad functional areas as a result of her mental disorders, finding moderate limitations in three functional areas—

(1) interacting with others, (2) concentrating, persisting, or maintaining pace, and (3) adapting or managing oneself—and mild limitations in the fourth area—understanding, remembering, or applying information. *See generally* 20 C.F.R. §§ 404.1520a(c), 416.920a(c) (explaining functional limitation rating process for mental impairments); 20 C.F.R. pt. 404, subpt. P, app.1, § 12.00(E) (explaining the four areas of mental functioning); *id.* § 12.00(F) (explaining process for using paragraph B criteria to evaluate mental impairments). In connection with listings 12.04 and 12.06, the ALJ also considered whether Feather's mental disorders were "serious and persistent," finding that her impairments had not required medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminished the symptoms and signs of her mental disorders, nor that she had achieved only marginal adjustment as a result. *See generally id.* § 12.00(G) (explaining process for using alternative paragraph C criteria to evaluate certain mental impairments).

Between steps three and four of the sequential-evaluation process, the ALJ assessed Feather's residual functional capacity ("RFC"). *See generally Myers*, 373 F. Supp. 3d at 534 n.4 (defining RFC). After

evaluating the relevant evidence of record, the ALJ found that Feather
had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b)
and 416.967(b),[1] with the following limitations:

> [T]he claimant can only occasionally climb
> ramps/stairs; can never climb ladders/ropes/scaffolds;
> must avoid all exposure to dangerous machinery and
> unprotected heights; is limited to the performance of
> simple, routine tasks involving only simple work-
> related decisions with few, if any, workplace changes;
> may not perform production pace work; and may have
> no contact with the public in the performance of job
> duties

(Tr. 20.)

In making these factual findings regarding Feather's RFC, the ALJ
considered her symptoms and the extent to which they could reasonably
be accepted as consistent with the objective medical evidence and other
evidence of record. *See generally* 20 C.F.R. §§ 404.1529, 416.929; Soc. Sec.
Ruling 16-3p, 2017 WL 5180304 (revised Oct. 25, 2017). The ALJ also
considered and articulated how persuasive he found the medical opinions
and prior administrative medical findings of record. *See generally* 20

---

[1] The Social Security regulations define "light work" as a job that
"involves lifting no more than 20 pounds at a time with frequent lifting
or carrying of objects weighting up to 10 pounds." 20 C.F.R. § 404.1567(b);
*id.* § 416.967(b).

C.F.R. §§ 404.1520c, 416.920c.

At step four, the ALJ concluded that Feather had no past relevant work.

At step five, the ALJ concluded that Feather was capable of performing work that exists in significant numbers in the national economy. Based on her age, education, work experience, and RFC, and based on testimony by the vocational expert, the ALJ concluded that Feather was capable of performing the requirements of representative occupations such as bakery racker (DOT # 524.687-018), housekeeping cleaner (DOT # 323.687-014), or small products assembler (DOT # 739.687-030). Based on this finding, the ALJ concluded that Feather was not disabled for Social Security purposes.

The plaintiff sought further administrative review of her claims by the Appeals Council, but her request was denied on July 20, 2021, making the ALJ's February 2021 decision the final decision of the Commissioner subject to judicial review by this court.

The plaintiff timely filed her complaint in this court on September 15, 2021. The Commissioner has filed an answer to the complaint, together with a certified copy of the administrative record. Both parties

have filed their briefs, and this matter is now ripe for decision.

## II.   DISCUSSION

Under the Social Security Act, the question before this court is not whether the claimant is disabled, but whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See generally* 42 U.S.C. § 405(g)(sentence five); *id.* § 1383(c)(3); *Myers*, 373 F. Supp. 3d at 533 (describing standard of judicial review for social security disability insurance benefits and supplemental security income administrative decisions).

Feather asserts on appeal that the ALJ's decision is not supported by substantial evidence because: (1) the ALJ found certain of her impairments "not severe" at step two of the five-step sequential evaluation process, despite compelling evidence to the contrary; (2) the ALJ failed to properly evaluate prior administrative findings, including the medical opinions of non-examining state agency medical and psychological consultants; (3) the ALJ failed to properly evaluate the medical opinions of an examining psychologist; (4) the ALJ failed to properly evaluate the medical opinions of her treating physician; and

(5) the ALJ failed to properly consider subjective evidence regarding Feather's symptoms, including statements or testimony by Feather herself.[2]

## A. Step Two Determination

The plaintiff appears to contend that the ALJ erred in finding that various of Feather's medical conditions were not severe impairments.

At step two, the ALJ found that Feather had several severe impairments including: epilepsy; migraine headaches; obesity; bipolar disorder; generalized anxiety disorder; major depressive disorder; obsessive-compulsive disorder; and panic disorder. The ALJ then proceeded on to step three of the five-step sequential evaluation process.

At step two, a claimant bears the burden of proving that she suffers from "a medically severe impairment or combination of impairments."

---

[2] The plaintiff's brief articulated three conclusory, extremely general claims of error: (1) the ALJ's RFC determination failed to include all limitations caused by her severe impairments; (2) the ALJ's RFC determination failed to include all limitations caused by impairments the ALJ found to be non-severe, or never mentioned; and (3) the ALJ's RFC determination was defective because the ALJ failed to afford appropriate weight to medical opinions on which it was based. Although not clearly articulated by plaintiff's counsel, a close reading of the plaintiff's brief reveals that these very generalized grievances rest on the specific errors we have articulated above.

*Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). But the step-two inquiry is merely "a *de minimis* screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). "[T]he analysis at step two is wholly independent of the analysis at later steps. . . . [N]ot finding certain impairments severe at step two does not affect the ultimate disability determination." *Alvarado v. Colvin*, 147 F. Supp. 3d 297, 311 (E.D. Pa. 2015); *see also Orr v. Comm'r Soc. Sec.*, 805 Fed. App'x 85, 88 (3d Cir. 2020) ("[B]ecause the ALJ progressed to a later step, any error at Step Two would not alter that remainder of the five-step process, much less the overall outcome."); *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019) (per curiam) ("Step two is a threshold inquiry; so long as one of a claimant's limitations is found to be severe, error at that step is harmless."); *Salles v. Comm'r of Soc. Sec.*, 229 Fed. App'x 140, 145 n.2 (3d Cir. 2007) ("Because the ALJ found in [the claimant's] favor at Step Two, even if he had erroneously concluded that some other impairments were nonsevere, any error was harmless.").

Here, the ALJ found in Feather's favor at step two, finding that she had several other severe impairments, and then proceeded on to step three of the five-step sequential evaluation process. Thus, any error with

respect to evaluation of the severity of any other impairments at step two was harmless and provides "no valid basis for remand." *See Orr*, 805 Fed. App'x at 88.

## B. Medical Opinions and Prior Administrative Findings

The plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ erred in his evaluation of conflicting medical opinions and prior administrative findings presented in the administrative proceedings below. As a preface, we note the well-established principle that, in evaluating the medical opinion evidence of record, an "ALJ is not only entitled, but required to choose between" conflicting medical opinions. *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent [an ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). Moreover, "[i]n the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute [our own] conclusions for those of the fact-finder.'" *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)). Ultimately, to reverse the ALJ's findings and

decision, "we must find that the evidence not only *supports* [a contrary] conclusion, but *compels* it." *Immigration & Naturalization Serv. v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992); *see also Smith v. Chater*, 99 F.3d 780, 782 & N.3 (6th Cir. 1996) (citing *Elias-Zacarias* in the context of social security disability benefits); *Hert v. Barnhart*, 234 F. Supp. 2d 832, 837 (N.D. Ill. 2002) ("The court may reverse the Commissioner's decision only if the evidence 'compels' reversal, not merely because the evidence supports a contrary decision.") (citing *Elias-Zacarias*).

Here, the plaintiff originally filed her administrative claim for benefits in August 2017. Thus, a relatively new regulatory framework governing the evaluation of medical opinion evidence applies to this case.

"The new regulations have been described as a 'paradigm shift' in the way medical opinions are evaluated." *Knittle v. Kijakazi*, Civil No. 1:20-CV-00945, 2021 WL 5918706, at *4 (M.D. Pa. Dec. 15, 2021). "Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy." *Densberger v. Saul*, Civil No. 1:20-CV-772, 2021 WL 1172982, at *7 (M.D. Pa. Mar. 29, 2021). Under this prior regulatory scheme, the Social Security

Administration "followed the 'treating physician rule,' which required the agency to give controlling weight to a treating source's opinion, so long as it was 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and not 'inconsistent with the other substantial evidence' in the record." *Michelle K. v. Comm'r of Soc. Sec.*, 527 F. Supp. 3d 476, 481 (W.D. Pa. 2021). However, the regulations governing the evaluation of medical evidence were amended and the treating physician rule was eliminated effective March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5,844 (Jan. 18, 2017); *see also Densberger*, 202 WL 1172982, at *7–*8; *Michelle K.*, 527 F. Supp. 3d at 481. "The range of opinions that ALJs were enjoined to consider were broadened substantially and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis." *Densberger*, 2021 WL 1172982, at *7.

Under these new regulations, the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520(a), 416.920c(a), "Rather than assigning weight to medical opinions, [an ALJ]

will articulate 'how persuasive' he or she finds the medical opinions." *Knittle*, 2021 WL 5918706, at *4; *see also* 20 C.F.R. §§ 404.1520, 416.920c(b). If a medical source provides one or more medical opinions, the agency will consider those medical opinions from that medical source together using the following factors: "(1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, purpose and extent of the treatment relationship, and the examining relationship; (4) specialization; and (5) any other factors that 'tend to support or contradict a medical opinion or prior administrative medical finding.'" *Michelle K.*, 527 F. Supp. 3d at 481; *see also* 20 C.F.R. §§ 404.1520c(a), 416.920c(a); *Densberger*, 2021 WL 1172982, at *8. Under the new regulations, "[t]he two 'most important factors for determining the persuasiveness of medical opinions are consistency and supportability,' which are the 'same factors' that formed the foundation of the treating source rule." *Densberger*, 2021 WL 1172982, at *8; *see also* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Michelle K.*, 527 F. Supp. 3d at 481; *compare* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) (supportability), and *id.* §§ 404.1520c(c)(2), 416.920c(c)(2) (consistency),

*with id.* §§ 404.1527(c)(3), 416.927(c)(3) (supportability), and *id.* §§ 404.1527(c)(4), 416.927(c)(4) (consistency).[3] An ALJ is specifically required to address these two factors in his or her decision. *See* 20 C.F.R. §§ 404.1520(c)(b)(2), 416.920c(b)(2); *see also Densberger*, 2021 1172982, at *8; *Michelle K.*, 527 F. Supp. 3d at 482. "The ALJ may—but is not required to—explain how he considered the remaining factors." *Michelle K.*, 527 F. Supp. 3d at 482; *see also* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Densberger*, 2021 WL 1172982, at *8. "However, when the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered [the remaining] factors . . . ."

---

[3] With respect to supportability, the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). With respect to consistency, the new regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2).

*Densberger*, 2021 WL 1172982, at *8; *see also* 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3); *Michelle K.*, 527 F. Supp. 3d at 482.

### 1. *State Agency Medical and Psychological Consultants*

The prior administrative findings in this case included the opinions of a state agency psychological consultant, George Ondis, Ph.D., recorded on November 21, 2017, and the opinions of a state agency medical consultant, Candelaria Legaspi, M.D., recorded on November 22, 2017.

Based on his review of Feather's medical records, Dr. Ondis considered whether Feather's medically determinable mental impairments met or medically equaled the severity of the listed impairments, finding that Feather failed to satisfy the "B" or "C" criteria of the listings. Dr. Ondis found that Feather had no more than moderate limitations in any of the four areas of mental functioning: he found that she had moderate limitations in the area of concentrating, persisting, or maintaining pace and the area of adapting or managing oneself, and that she had mild limitations in the area of understanding, remembering, or applying information and the area of interacting with others. Dr. Ondis evaluated Feather's mental residual functional capacity as well, finding that Feather was subject to moderate limitations in her ability to

understand, remember, and carry out detailed instructions, her ability to maintain attention and concentration for extended periods, her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, her ability to interact appropriately with the general public, and her ability to respond appropriately to changes in the work setting, with no other limitations noted. Ultimately, Dr. Ondis opined that Feather could be "expected to understand and remember simple, one and two-step instructions" or "perform one and two-step tasks," and that she could "maintain regular attendance and be punctual within reasonable expectations." (Tr. 132–33, 136–39; Tr. 148–49, 152–55.) In evaluating Dr. Ondis's opinion, the ALJ stated:

> The undersigned finds persuasive the opinion of the November 2017 State agency psychological consultant, determining the claimant's mental health impairments as severe, but noting the claimant nonetheless maintains the ability to understand, retain, and follow simple instructions and directions; perform simple, routine, and repetitive task[s]; and maintain[s] the basic mental demands of performing routine tasks on a sustained basis.

(Tr. 25 (citation omitted).)

Based on her review of Feather's medical records, Dr. Legaspi found Feather had no exertional limitations at all, but some postural and environmental limitations. Dr. Legaspi found that, due to her epilepsy, Feather was capable of occasional climbing of ramps or stairs, but never ladders, ropes, or scaffolds, and Feather should avoid all exposure to machinery, heights, or other hazards. Dr. Legaspi found no other work-related limitations. (Tr. 134–36; Tr. 150–52.) In evaluating Dr. Legaspi's opinion, the ALJ stated:

> The undersigned finds somewhat persuasive the opinion of the November 2017 State agency medical consultant, determining the claimant as capable of a broad range of exertional activities, except noting the claimant could only occasionally climb ramps/stairs; could never climb ladders/ropes/scaffolds; and must avoid all exposure to hazards. While the opinion is generally consistent with the claimant's treatment record indicating the claimant's seizures have responded well to medications, the undersigned further limited the claimant to light work to accommodate any reasonable exertional restrictions given the claimant's obesity and further limited the claimant's cognitive, adaptive, and social abilities to further accommodate not only the claimant's mental health disorders, but migraines as well.

(Tr. 25 (citations omitted).)

The plaintiff only addresses the evaluation of these particular medical opinions in passing, in the penultimate paragraph of her brief.

She appears to primarily object to this evaluation of the state agency medical and psychological consultants' findings and opinions based solely on the fact that, unlike her treating physician, the consultants never actually examined Feather in person. But the medical opinion of a non-examining medical source, such as a state agency medical or psychological consultant, may serve as substantial evidence to the extent the opinion is consistent with other medical evidence in the record. *See Nichols v. Comm'r of Soc. Sec.*, 404 Fed. App'x 701, 704–05 (3d Cir. 2010); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *My-Lein L. v. Comm'r of Soc. Sec.*, 551 F. Supp. 3d 100, 107 (W.D.N.Y. 2021); *Ortiz v. Comm'r of Soc. Sec.*, 309 F. Supp. 3d 189, 205 (S.D.N.Y. 2018).

Accordingly, we find the ALJ's evaluation of the prior administrative findings concerning the plaintiff's physical and mental limitations, including the medical opinions of the state agency medical and psychological consultants, is supported by substantial evidence and was reached based upon a correct application of the relevant law.

### 2. Consultative Examining Psychologist

The record before the ALJ included a consultative psychological evaluation report based on a January 2014 psychological examination.

The ALJ noted that Feathers had been evaluated by a consultative examining psychologist, James J. Nolan, Ph.D., on January 6, 2014. Based on his examination of Feather and a review of her counseling and medical treatment records, Dr. Nolan found that Feather had mild limitations in her ability to understand, remember, and carry out simple instructions or to make judgments on simple work-related decisions, moderate limitations in her ability to understand, remember, and carry out complex instructions, and marked limitations in her ability to make judgments on complex work-related decisions. Dr. Nolan further found that, although she had no limitations in her ability to interact with the general public, Feather had moderate limitations in her ability to interact with supervisors and mild limitations in her ability to interact with co-works or to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 486–90.)

In evaluating Dr. Nolan's opinion, the ALJ stated:

> The undersigned does not find Dr. Nolan's opinion persuasive because it is too remote to the period at issue to provide any probative value toward an assessment of the claimant's residual functional capacity after the alleged onset date.

(Tr. 24.)

The plaintiff only addresses the evaluation of this particular medical opinion in passing, in the same penultimate paragraph of her brief as the state agency medical and psychological consultant opinions. She suggests that the ALJ erred in finding the non-examining consultants' opinions more persuasive than Dr. Nolan's opinion, as the non-examining consultants' opinions were also "remote in time" from the date of the ALJ's decision.

But the ALJ did not err in discounting Dr. Nolan's opinion under these circumstances. "An ALJ is entitled to discount a medical opinion, like the opinion offered here, which is remote in time." *Black v. Berryhill*, Civil No. 3:16-CV-1768, 2018 WL 4189661, at \*10 (M.D. Pa. Apr. 13, 2018), *report & recommendation adopted by* 2018 WL 4184303 (M.D. Pa. Aug. 31, 2018). As the ALJ noted, Dr. Nolan's opinion was rendered based on an examination that occurred *more than three years* before the plaintiff's alleged onset date. *See Sanchez v. Kijakazi*, Civil No. 1:21-cv-36, 2022 WL 906046, at \*13 (M.D. Pa. Mar. 28, 2022) (finding ALJ's decision to "eschew . . . temporally remote medical opinions" describing claimant's condition three years prior to alleged onset date in favor of contemporary medical opinions by state agency medical experts was

"entirely reasonable"). Although the state agency medical and psychological consultants' opinions were rendered months or years before the ALJ's second and final decision was issued, they were rendered *after* the plaintiff's alleged disability onset date, and thus, unlike Dr. Nolan's opinion based on an examination conducted *several years before* the alleged onset date, the state agency consultants' opinions constitute relevant evidence of the plaintiff's functional impairments during the relevant time period.

Accordingly, we find the ALJ's evaluation of the January 2014 medical opinion by a consultative examining psychologist, Dr. Nolan, is supported by substantial evidence and was reached based upon a correct application of the relevant law.

### 3. Treating Family Physician

The record before the ALJ included two sets of physical and mental residual functional capacity questionnaires completed by Feather's treating family physician, Aaron B. Lane, M.D.

On November 27, 2018, Dr. Lane completed a physical residual functional capacity questionnaire. Dr. Lane noted that Feather had been a patient of his since 2009, and he had seen her every one to three months

since she began treating with him. Dr. Lane reported diagnoses of major depression, panic disorder with agoraphobia, bipolar affective disorder, generalized anxiety disorder, obsessive-compulsive disorder, seizure disorder, a history of closed head trauma, and chronic migraines, with a poor prognosis. Dr. Lane reported her symptoms as including depression, severe anxiety, dizziness, headaches, and seizures. He described her pain as frequent and recurrent debilitating migraines. When asked to identify clinical findings and objective signs, Dr. Lane reported that her medical record included EEG results, MRI of the brain, and CT scans of her head, and that she frequently appeared overtly depressed in his office, occasionally inconsolable, and frequently with trouble expressing herself. Dr. Lane noted that Feather was currently on antiepileptic medications and psychiatric medications, the side effects of which included dizziness, decreased concentration, and drowsiness. Dr. Lane opined that Feather's experience of pain or other symptoms was severe enough to constantly interfere with attention and concentration needed to perform even simple tasks. Dr. Lane opined that Feather was incapable of performing even low-stress jobs. He opined that Feather was capable of sitting up to four hours per workday and standing or walking up to four hours per

workday, with no more than one hour of uninterrupted sitting, standing, or walking, provided she was allowed a five-minute break to walk around every sixty to ninety minutes, with an at-will sit/stand/walk option. Dr. Lane further opined that Feather was required to take an unscheduled five- to fifteen-minute break from work every one to three hours. Dr. Lane opined that Feather was capable of lifting or carrying up to 10 pounds frequently and up to 20 pounds occasionally. He opined that she was capable of holding her head in a static position only occasionally. Due to severe dizziness, Dr. Lane opined that Feather was capable of stooping, bending, crouching, squatting, or climbing stairs only rarely, and she could never climb ladders. Dr. Lane opined that Feather's impairments would cause her to be absent from work *ten to fifteen* days per month, and to be "off task" more than 15% of a given workday. (Tr. 1091–96.)

That same day, Dr. Lane completed a mental residual functional capacity questionnaire. Dr. Lane reiterated the information regarding treatment history and frequency, diagnoses, and prognosis. He reported that Feather had a high GAF score of 60 within the past year, and a

current GAF score of 45.[4] With respect to the functional area of understanding, remembering, or applying information, Dr. Lane opined that Feather had: an extreme limitation in her ability to identify and solve problems; a marked limitation in her ability to ask and answer questions and provide explanations; moderate limitations in her ability to understand and learn work-like terms, instructions, and procedures, her ability to recognize and correct mistakes, her ability to sequence and complete multi-step activities, and her ability to use reason and judgment to make work-related decisions; and mild limitations in her ability follow one- or two-step oral instructions, and her ability to describe work activity to someone else. With respect to the functional area of interacting with others, Dr. Lane opined that Feather had:

---

[4] A GAF score, given on a scale of 1 to 100, is a "rough estimate" of an individual's psychological, social, and occupational functioning, used to assess the need for treatment. *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998). "A GAF score is set within a particular range if either the symptom severity *or* the level of functioning falls within that range. The score is useful in planning treatment and predicting outcomes." *Schwartz v. Colvin*, No. 3:12-CV-01070, 2014 WL 257846, at *5 n.15 (M.D. Pa. Jan. 23, 2014) (citation omitted). "A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning." *Id.* (citation omitted).

extreme limitations in her ability to handle conflicts with others and her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; marked limitations in her ability to ask for help when needed, her ability to respond appropriately to requests, suggestions, criticisms, correction, and challenges, and her ability to keep social interactions free from excessive irritability, sensitivity, argumentativeness, or suspiciousness; moderate limitations in her ability to cooperate with others, her ability to state her own point of view, her ability to initiate or sustain conversation, and her ability to interact appropriately with the general public; and mild limitations in her ability to understand and respond to social cues. With respect to the functional area of sustained concentration, persistence, or pace, Dr. Lane opined that Feather had: extreme limitations in her ability to complete tasks in a timely manner, her ability to sustain ordinary routine and regular attendance at work, and her ability to work a full day without needing more than the allotted number or length of rest periods during the day; marked limitations in her ability to initiate and perform tasks that she understands and knows how to do, her ability to work at an appropriate and consistent pace, and her ability to ignore or avoid

distractions while working; and moderate limitations in her ability to change activities or work settings without being disruptive and her ability to work close to or with others without interrupting or distracting them. With respect to the functional area of adapting or managing oneself, Dr. Lane opined that Feather had: extreme limitations in her ability to manage psychologically based symptoms, her ability to set realistic goals, and her ability to make plans for herself independently of others; marked limitations in her ability to adapt to changes, her ability to distinguish between acceptable and unacceptable work performance, and her ability to maintain personal hygiene and attire appropriate to the work setting; and moderate limitations in her ability to respond to demands and her ability to be aware of normal hazards and taking appropriate precautions. He reiterated his opinion that Feather's impairments would cause her to be "off task" for more than 15% of a given workday, and he opined that she would be absent from work *five to fifteen days* per month due to her mental impairment or treatment.[5] Dr. Lane stated his belief that she was unable to work on a regular and sustained

---

[5] We note that this is inconsistent with the ten to fifteen days stated in his physical RFC questionnaire responses.

basis due to her mental impairments. (Tr. 1097–1101.)

On January 4, 2021, Dr. Lane provided an updated physical residual functional capacity questionnaire. He noted that he continued to see Feather, but now at a weekly or monthly frequency. He reported updated diagnoses of recurrent major depression, bipolar disorder, attention deficit hyperactivity disorder, seizure disorder, migraine headaches, back and neck pain, and right knee pain. He reiterated the opinions stated in his earlier physical RFC questionnaire, but opined that Feather was now limited to a maximum of thirty minutes sitting or fifteen minutes standing at one time, and a total of four hours sitting and less than two hours standing or walking each workday, provided she was allowed a five-minute break to walk around every thirty minutes, with an at-will sit/stand/walk option. Dr. Lane further opined that Feather was required to take an unscheduled five- to ten-minute break from work every thirty minutes. Dr. Lane opined that Feather was now only capable of lifting or carrying up to 10 pounds rarely. He opined that she was now capable of flexing or turning her neck or holding it in a static position only rarely, and she could only rarely twist, stoop, bend, crouch, squat, climb ladders, or climb stairs. Dr. Lane opined that Feather's

impairments would cause her to be "off task" more than 15% of a given workday. (Tr. 2077–82.)

That same day, Dr. Lane provided an updated mental residual functional capacity questionnaire as well. He noted that Feather was now seeing a therapist and psychiatrist weekly. He reported that Feather had a high GAF score of 61 within the past year, and a current GAF score of 49. With respect to the functional area of understanding, remembering, or applying information, Dr. Lane opined that Feather had: no extreme limitations; marked limitations in her ability to identify and solve problems, her ability to sequence and complete multi-step activities, and her ability to use reason and judgment to make work-related decisions; moderate limitations in her ability to understand and learn work-like terms, instructions, her ability to describe work activity to someone else, her ability to ask and answer questions and provide explanations, and her ability to recognize and correct mistakes; and mild limitations in her ability follow one- or two-step oral instructions. With respect to the functional area of interacting with others, Dr. Lane opined that Feather had: no extreme limitations; marked limitations in her ability to keep social interactions free from excessive irritability, sensitivity,

argumentativeness, or suspiciousness; moderate limitations in her ability to handle conflicts with others, her ability to state her own point of view, and her ability to respond appropriately to requests, suggestions, criticisms, correction, and challenges; and mild limitations in her ability to cooperate with others, her ability to ask for help when needed, her ability to initiate or sustain conversation, her ability to understand and respond to social cues, her ability to interact appropriately with the general public, and her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. With respect to the functional area of sustained concentration, persistence, or pace, Dr. Lane opined that Feather had: no extreme limitations; marked limitations in her ability to complete tasks in a timely manner, her ability to ignore or avoid distractions while working, and her ability to change activities or work settings without being disruptive, and her ability to work a full day without needing more than the allotted number or length of rest periods during the day; and moderate limitations in her ability to initiate and perform tasks that she understands and knows how to do, her ability to work at an appropriate and consistent pace, her ability to work close to or with others without interrupting or distracting them,

and her ability to sustain ordinary routine and regular attendance at work. With respect to the functional area of adapting or managing oneself, Dr. Lane opined that Feather had: extreme limitations in her ability to manage psychologically based symptoms; marked limitations in her ability to respond to demands, her ability to adapt to changes, her ability to distinguish between acceptable and unacceptable work performance, her ability to set realistic goals, and her ability to make plans for herself independently of others; moderate limitations in her ability to be aware of normal hazards and taking appropriate precautions; and mild limitations in her ability to maintain personal hygiene and attire appropriate to the work setting. Dr. Lane reiterated his opinion that Feather's impairments would cause her to be "off task" for more than 15% of a given workday, and he opined that she would be absent from work *twenty to thirty days* per month due to her mental impairment or treatment.[6] He stated his belief that she was unable to work on a regular and sustained basis due to her mental impairments. (Tr. 2083–87.)

---

[6] We note that this is inconsistent with Dr. Lane's statement in his physical RFC questionnaire responses that Feather's impairments were not likely to produce "good days" and "bad days." (*See* Tr. 2081).

Upon review, the ALJ found that these opinions by Dr. Lane were unpersuasive. In particular, with respect to the November 2018 reports, the ALJ found that:

> the extreme degree of functional loss [stated in the November 2018 reports] is inconsistent with the claimant's demonstrated performance of even part-time employment as a home health aide. Were the claimant as limited as opined by Dr. Lane, either by physical, cognitive, social, or adaptive abilities, the claimant would have been unable to sustain her part-time employment. Moreover, this degree of functional loss is not consistent with the claimant's further admissions regarding her retained capacity for activities of daily living.

(Tr. 25.) The ALJ also considered the January 2021 reports, stating:

> [The January 2021 reports] are inconsistent with and not supported by [Dr. Lane's] own examination results, including normal psychiatric findings. Additionally, on one form he noted the claimant as having no expectation of absenteeism from work due to her conditions, but noted on the other that the claimant would be fully unable to sustain work on a regular basis, reporting the claimant as likely being absent from work 20-30 days per month.

(*Id.*)

Here, the ALJ properly considered the medical evidence of record

and the relevant factors of supportability and consistency.[7] He expressly articulated the basis of his evaluation and his findings with respect to the persuasiveness of these opinions as well.

Accordingly, we find the ALJ's evaluation of the opinions of treating physician Dr. Lane is supported by substantial evidence and was reached based upon a correct application of the relevant law.

## C. Subjective Evidence of the Plaintiff's Symptoms

The plaintiff appears to also contend that the ALJ's decision is not supported by substantial evidence because the ALJ erred in his evaluation of Feather's symptoms, including subjective statements or testimony by Feather herself. *See generally* 20 C.F.R. §§ 404.1502(i),

---

[7] The plaintiff argues in her brief that the ALJ's evaluation was deficient because it failed to also explicitly address the several treatment relationship factors set forth in 20 C.F.R. § 404.1520(c)(3) and § 416.920c(c)(3). But, as we have noted above, the regulations only require an ALJ to explicitly discuss the factors of consistency and supportability. *See* 20 C.F.R. §§ 404.1520(c)(b)(2), 416.920c(b)(2); *see also Densberger*, 2021 1172982, at *8; *Michelle K.*, 527 F. Supp. 3d at 482. "The ALJ may—but is not required to—explain how he considered the remaining factors." *Michelle K.*, 527 F. Supp. 3d at 482; *see also* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Densberger*, 2021 WL 1172982, at *8. Here, the ALJ has not found another medical opinion to be equally well supported and consistent with the record, and so he was not required to explicitly discuss these other factors. *See* 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3); *see also Densberger*, 2021 WL 1172982, at *8; *Michelle K.*, 527 F. Supp. 3d at 482.

416.902(n) ("Symptoms means your own description of your physical or mental impairment.").

Standing alone, a claimant's allegation of pain or other symptoms is not enough to establish an impairment or disability. 20 C.F.R. § 416.929(a); *Prokopick v. Comm'r of Soc. Sec.*, 272 Fed. App'x 196, 199 (3d Cir. 2008) ("Under the regulations, an ALJ may not base a finding of disability solely on a claimant's statements about disabling pain . . . ."). "An ALJ is permitted to reject a claimant's subjective testimony as long as he or she provides sufficient reasons for doing so." *Prokopick*, 272 Fed. App'x at 199 (citing *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999)).

When evaluating a claimant's subjective allegations of pain or other symptoms, an ALJ utilizes a two-step process. Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *2 (revised Oct. 25, 2017). First, the ALJ must determine whether there is a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. *Id.* at *3; *see also* 20 C.F.R. §§ 404.1529(b), 416.929(b). A claimant cannot be found to be "disabled based on alleged symptoms alone." Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4.

Once the ALJ has found that a medically determinable impairment has been established, the ALJ must then evaluate the claimant's allegations about the intensity, persistence, or functionally limiting effects of his or her symptoms against the evidence of record. *Id.* This evaluation requires the ALJ to consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.*

Here, in evaluating the plaintiff's symptoms, the ALJ expressly considered and extensively discussed both the medical and non-medical evidence in the record. (Tr. 20–26.) This included the plaintiff's statements regarding the limiting effects of her symptoms. Based on his consideration of the whole record, the ALJ properly concluded that, while Feather's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 21.)

Although Feather quibbles with the outcome of the ALJ's analysis of the evidence of record, it is clear that the ALJ properly evaluated the claimant's symptoms in accordance with the applicable regulations, and that the ALJ reasonably concluded that, notwithstanding the claimant's subjective complaints of pain and other symptoms, the evidence as a whole did not support physical or mental limitations in excess of those set forth in the ALJ's RFC determination. While this same evidence might have also reasonably supported the adoption of substantially greater limitations, it did not compel such a finding.

Accordingly, we find the ALJ's evaluation of the subjective evidence of the plaintiff's symptoms is supported by substantial evidence and was reached based upon a correct application of the relevant law.

## III.   CONCLUSION

Based on the foregoing, we conclude that the Commissioner's finding that Feather was not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. Accordingly, the Commissioner's decision denying disability benefits is **AFFIRMED**.

An appropriate Order follows.


Dated: March 29, 2023              ***s/Joseph F. Saporito, Jr.***
                                   JOSEPH F. SAPORITO, JR.
                                   United States Magistrate Judge